ORIGINAL

FILED

JUL 30 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
       – and –
6  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
7  655 West Broadway, Suite 1900
   San Diego, CA 92101
8  Telephone: 619/231-1058
   619/231-7423 (fax)
9  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
10
   Attorneys for Plaintiff
11
   [Additional counsel appear on signature page.]
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
15  CORY DRAPER, Individually and on Behalf    )  No. CV 12 4017 RS
    of All Others Similarly Situated,          )
16                                             )  CLASS ACTION
                         Plaintiff,            )
                                               )  COMPLAINT FOR VIOLATION OF THE
17       vs.                                   )  FEDERAL SECURITIES LAWS
                                               )
18  ZYNGA, INC., MARK PINCUS, DAVID M.         )
    WEHNER and JOHN SCHAPPERT,                 )
19                                             )
                         Defendants.           )
20  _____)  DEMAND FOR JURY TRIAL
21
22
23
24
25
26
27
28

E-filing

1

**INTRODUCTION**

2    1.    Plaintiff makes the following allegations, except as to allegations specifically
3  pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's
4  counsel, including analysis of publicly available news articles and reports, public filings, securities
5  analysts' reports and advisories about Zynga Inc. ("Zynga" or the "Company"), press releases and
6  other public statements issued by the Company, and media reports about the Company. Plaintiff
7  believes that substantial additional evidentiary support will exist for the allegations set forth herein
8  after a reasonable opportunity for discovery.

9

**NATURE OF THE ACTION**

10    2.    This is a securities class action alleging violations of the anti-fraud provisions of the
11  federal securities laws on behalf of all purchasers of Zynga common stock between December 16,
12  2011 and July 25, 2012, inclusive (the "Class Period"). The claims asserted herein are brought
13  against Zynga and certain of its current officers and directors, including the Chairman of the Board
14  of Directors and Chief Executive Officer ("CEO") Marc Pincus ("Pincus"), seeking to pursue
15  remedies under the Securities Exchange Act of 1934 ("1934 Act").

16    3.    Zynga, founded in 2007 as a developer of online social games, describes itself as the
17  world's leading provider of social game services, with 240 million average monthly active users, or
18  MAUs, in 175 countries. The Company claims to have launched the most successful social games in
19  the industry in each of the last three years and has generated over $1.85 billion in cumulative
20  revenue and over $2.35 billion in cumulative bookings since its inception in 2007. The Company's
21  games are accessible to players worldwide on Facebook and other social networks, mobile platforms
22  and Zynga.com. The Company generates substantially all of its revenue from players accessing
23  games via the Facebook platform. Most of Zynga's games are free to play, and revenue is generated
24  primarily through the in-game sale of virtual goods and advertising.

25

**SUMMARY**

26    4.    On December 15, 2011, the Company filed a Form S-1/A Registration Statement and
27  Prospectus for the Initial Public Offering ("IPO") of its Class A common shares to the public at
28  $10.00 per share. Among other things, the Company boasted of the strength and growth

1 opportunities of its current online games and games in development, and purported to warn investors
2 of the risk of its reliance on the Company's relationship with Facebook for the vast majority of its
3 bookings, revenue and earnings.

4     5.     On December 16, 2011, the Company closed its IPO, selling 100 million shares of its
5 Class A common stock raising approximately $1 billion. After the IPO, Zynga shares traded at
6 artificially inflated prices, reaching a high of $14.69 per share on March 2, 2012.

7     6.     On February 14, 2012, the Company issued its fourth quarter and fiscal year 2011
8 financial results and set the Company's financial guidance for fiscal year 2012, including bookings
9 of $1.35 billion to $1.45 billion and earnings per share ("EPS") of $0.24 to $0.28.

10     7.     March 21, 2012, Zynga issued a press release announcing that it had acquired a
11 Company called OMGPOP, a creator of social networking games and a particularly popular game
12 called "*Draw Something*," describing download statistics of *Draw Something* as "eye-popping."

13     8.     On or about March 23, 2012, the Company filed a Form S-1A Registration Statement
14 for the registration and offering of 42.9 million shares of its Class A common stock (the "Secondary
15 Offering"). The March 23, 2012 Registration Statement was declared effective on March 28, 2012
16 and the shares were priced at $12.00 per share.

17     9.     On March 28, 2012, the Company issued a press release announcing the pricing of its
18 Secondary Offering of 42.9 million shares of its Class A common stock at $12.00 per share.

19     10.     On April 3, 2012, the Company announced that it had completed the Secondary
20 Offering of 42.9 million shares and that the underwriters had sold the over-allotment of 6.4 million
21 shares. On April 3, 2012, in connection with the Secondary Offering, certain of the Company's
22 insiders, including Pincus, sold more than 18.8 million shares to the public at $12.00 per share for
23 total proceeds of more than $219 million.

24     11.     On April 26, 2012, the Company issued a press release announcing its financial
25 results for the first quarter of fiscal 2012 and *raising* the Company's bookings and EBITDA
26 guidance for the remainder of the fiscal year to $1.425-$1.5 billion and $400-$450 million,
27 respectively.

28

1     12.    Then on July 25, 2012, the Company issued a press release announcing second

2 quarter fiscal 2012 financial results below Wall Street estimates, stating that the Company had

3 experienced a sequential decline in bookings. The Company also substantially reduced its fiscal

4 2012 bookings, EBITDA and EPS outlook to below even the February 14, 2012 bookings and

5 earnings outlook, which the Company had later *increased* on April 26, 2012. The Company

6 explained that the prospects for its March 21, 2012 acquisition of *Draw Something* had dimmed, and

7 that changes to Facebook's web platform had hurt its results and outlook.

8     13.    On July 26, 2012, the Company's stock price plummeted 37% in response to the July

9 25, 2012 announcement of the Company's financial results, closing at $3.17 per share.

10     14.    The Class Period representations by defendants were each materially false and

11 misleading when made as defendants failed to disclose the true facts which were known or recklessly

12 disregarded by them, including the following:

13     (a)    The December 15, 2011 Registration Statement failed to disclose that under

14 Zynga's agreements with Facebook, Zynga game cards could only be distributed and redeemed on

15 Facebook until April 30, 2012, or the true extent of the current risk of Facebook policy changes on

16 Zynga's bookings prospects and overall financial condition;

17     (b)    Facebook, upon which the Company was heavily reliant for users and

18 bookings, had already begun to change its platform and user policies to a degree that would

19 negatively impact Zynga's current and future bookings metrics and growth prospects;

20     (c)    The March 2012 acquisition of OMGPOP and "Draw Something" could not

21 support the increased bookings and financial forecasts issued on April 26, 2012; and

22     (d)    In light of the facts set forth above, the Company did not have a reasonable

23 basis for the bookings, EBITDA and financial projections issued during the Class Period.

24                       **JURISDICTION AND VENUE**

25     15.    The claims herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

26 Jurisdiction is conferred by §27 of the 1934 Act.

27     16.    Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false

28 and misleading statements were made in or issued from this District.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS       - 3 -

1    17.    The violations of law complained of herein occurred in this District, including the

2    dissemination of materially false and misleading statements complained of herein into this District.

3    Defendant Zynga is headquartered and conducts business in this District.

4                                    **PARTIES**

5    18.    Plaintiff Cory Draper acquired the common stock of Zynga during the Class Period,

6    as set forth in the accompanying certification, and has been damaged thereby.

7    19.    Defendant Zynga is a provider of online networking games.  Zynga is a Delaware

8    corporation headquartered in San Francisco, California.  Its stock is traded in an efficient market on

9    the NASDAQ Global Select Market.

10    20.    Defendant Mark Pincus ("Pincus") is and was at all relevant times Chairman of the

11    Board of Directors and CEO of the Company.

12    21.    Defendant David M. Wehner ("Wehner") is and was at all relevant times Chief

13    Financial Officer of the Company.

14    22.    Defendant John Schappert ("Schappert") is and was at all relevant times Chief

15    Operating Officer and a director of the Company.

16    23.    The defendants referenced above in ¶¶20-22 are referred to herein as the "Individual

17    Defendants."

18                    **FALSE AND MISLEADING STATEMENTS**

19    24.    On December 15, 2011, the Company filed a Form S-1/A Registration Statement for

20    the initial public offering of its Class A common shares to the public.  Though the December 15,

21    2011 Registration Statement purported to warn investors of the potential risks associated with

22    Zynga's relationship with Facebook, the Registration Statement failed to disclose that certain

23    agreements already in place with Facebook were scheduled to expire on April 30, 2012, and would

24    directly impact the Company's bookings revenue and overall financial condition:

25        *Bookings*

26              To provide investors with additional information about our financial results,
we disclose within this prospectus bookings, a non-GAAP financial measure. We

27         have provided below a reconciliation between bookings and revenue, the most
directly comparable GAAP financial measure.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bookings is a non-GAAP financial measure that we define as the total amount of revenue from the sale of virtual goods in our online games and from advertising that would have been recognized in a period if we recognized all revenue immediately at the time of the sale. We record the sale of virtual goods as deferred revenue and then recognize that revenue over the estimated average life of the purchased virtual goods or as the virtual goods are consumed. Advertising revenue consisting of certain branded virtual goods and sponsorships is also deferred and recognized over the estimated average life of the branded virtual good, similar to online game revenue. Bookings is calculated as revenue recognized in a period plus the change in deferred revenue during the period.

\*       \*       \*

We have benefited from facebook's strong brand recognition and large user base. If Facebook loses its market position or otherwise falls out of favor with Internet users, we would need to identify alternative channels for marketing, promoting and distributing our games, which would consume substantial resources and may not be effective. In addition, Facebook has broad discretion to change its terms of service and other policies with respect to us and other developers, and those changes may be unfavorable to us. For example, in 2010 Facebook adopted a policy requiring applications on Facebook accept only its virtual currency, Facebook Credits, as payment from users. As a result of this change, which we completed in April 2011, Facebook receives a greater share of payments made by our players than it did when other payment options were allowed. Facebook may also change its fee structure, add fees associated with access to and use of the Facebook platform, change how the personal information of its users is made available to application developers on the Facebook platform or restrict how Facebook users can share information with friends on their platform.

25.     On December 15, 2011, the Company issued a press release announcing the pricing of the IPO at $10.00 per share:

**Zynga Inc. Prices Initial Public Offering**

. . . Zynga Inc. today announced the pricing of its initial public offering of 100,000,000 shares of Class A common stock at a price to the public of $10.00 per share. In addition, certain of Zynga's stockholders have granted the underwriters a 30-day option to purchase up to an additional 15,000,000 shares to cover over-allotments, if any. Zynga will not receive any proceeds from the sale of shares by the selling stockholders.

26.     On December 15, 2011, Zynga shares began trading on the NASDQAQ at prices as high as $11.50 per share.

27.     On February 14, 2012, the Company issued its fourth quarter and fiscal year 2011 financial results and set the Company's financial guidance for fiscal year 2012, including bookings of $1.35 billion to $1.45 billion and EPS of $0.24 to $0.28:

1    **Zynga Reports Fourth Quarter and Full Year 2011 Financial Results**

2
> - *Q4 Record Bookings of $306.5 Million, Up 26% Year-Over-Year and Up 7% From Q3*

3

4
> - *Strong Growth in Player Network with 153 Million Monthly Unique Users in Q4*

5

6
    . . . Zynga Inc., the world's leading provider of social game services, today announced financial results for the fourth quarter and full year ended December 31, 2011.

7
> - *Full year 2011 record bookings of $1.16 billion, up 38% year-over-year, and revenue of $1.14 billion, up 91% year-over-year*

8

9
> - *Full year 2011 adjusted EBITDA of $303.3 million*

> - *Full year 2011 non-GAAP EPS of $0.24 and GAAP EPS of ($1.40)*

10

11
> - *Q4 record bookings of $306.5 million, up 26% year-over-year and up 7% from the prior quarter*

12
> - *Q4 adjusted EBITDA of $67.8 million, down 34% year-over-year*

13
> - *Q4 non-GAAP EPS of $0.05*

14
           \*      \*      \*

15    **2012 Outlook**

16
    As of today, we are providing the following outlook for 2012:

17
> - ***Bookings are projected to be in the range of $1.35 billion to $1.45 billion.*** We expect that growth will be weighted towards the back-half of the year

18
> with slower sequential growth in the first half of the year.

19
> - ***Adjusted EBITDA is projected to be in the range of $390 million to $440 million.***

20
           \*      \*      \*

21
> - Capital expenditures are projected to be in the range of $140 million to $160

22
> million. Our effective tax rate for non-GAAP net income is projected to be in the range of 20% to 25%.

23

24
> - We project non-GAAP weighted-average diluted shares outstanding to be approximately 865 million shares in Q1 2012 and approximately 890 million shares in Q4 2012. ***Full year 2012 non-GAAP EPS is projected to be in the***

25
> ***range of $0.24 to $0.28.***

26      28.      On February 28, 2012, the Company filed its Form 10-K for the fiscal year ending

27 December 31, 2011. The Form 10-K repeated in substantial part the financial results reported on

28 February 14, 2012, and included a new disclosure that its current contract with Facebook for usage

1  of Zynga's game card program was set to expire in a mere two months and that future bookings

2  revenue may be impacted if the agreement is not extended beyond April 30, 2012:

3        We have benefited from facebook's strong brand recognition and large user base. If Facebook loses its market position or otherwise falls out of favor with

4  Internet users, we would need to identify alternative channels for marketing, promoting and distributing our games, which would consume substantial resources

5  and may not be effective. In addition, Facebook has broad discretion to change its terms of service and other policies with respect to us and other developers, and those

6  changes may be unfavorable to us. For example, in 2010 Facebook adopted a policy requiring applications on Facebook accept only its virtual currency, Facebook

7  Credits, as payment from users. As a result of this change, which we completed in April 2011, Facebook receives a greater share of payments made by our players than

8  it did when other payment options were allowed. ***Future bookings and revenue may be negatively impacted if our current game card program is not extended beyond***

9  ***April 30, 2012. Our contract with Facebook allows us to continue to distribute our game cards until April 30, 2012.***

10

11      29.    On March 14, 2012, the Company announced that it had filed a Registration

Statement with the SEC for a proposed secondary offering of its Class A common shares.

12

13      30.    March 21, 2012, Zynga issued a press release announcing that it had acquired a

Company called OMGPOP, a creator of social networking games and a particularly popular game

14

called "*Draw Something*," describing download statistics of *Draw Something* as "eye-popping":

15

16  **Zynga Acquires OMGPOP, Creators of the Cultural Hit "Draw Something"**

17      . . . Zynga, the world's leading provider of social game services, today announced it has acquired New York-based social game developer OMGPOP,

18  makers of the popular cultural hit mobile game, *Draw Something*, and over 35 additional social games. As a part of the Zynga family, OMGPOP will focus on

19  building new mobile IP and strengthening its existing portfolio of fun and creative social games.

20                               \*      \*      \*

21      ***In the six weeks since Draw Something launched, it has been downloaded over 35 million times. Draw Something's eye-popping stats include***:

22

23  - In the last week, more than 1 billion drawings have been created.

24  - *Draw Something* had three drawings per second the day the game launched.

25  - Yesterday, *Draw Something* has over 3,000 drawings per second at its peak.

26  - *Draw Something* is the #1 word game in 84 countries according to the Apple App Store" shout out to Sweden and Norway for being the first two countries

27  to recognize Draw Something's greatness. Nordic Love!

                             \*      \*      \*

28

1    OMGPOP began as *iminlikewithyou*, a social network for people to meet and
2    play games. The company soon after launched its social gaming website,
     OMGPOP.com in 2009. OMGPOP is best known for *Draw Something*, one of the
3    fastest growing word games of all time. The game has stormed to success through a
     combination of creativity and nostalgia paired with pop culture hooks. How would
4    you draw Jeremy Lin, Katniss Everdeen or LMFAO? *Draw Something* is available
     on iOS, Android and Facebook.

5    31.    After the March 21, 2012 press release, Zynga stock continued to trade at artificially

6    inflated prices, closing at $13.76 on March 22, 2012.

7    32.    On March 23, 2012, the Company filed a Form S-1/A Registration Statement (and

8    Amendments thereto) in connection with its secondary offering of its common stock to the public.

9    The Secondary Offering would consist of 42.9 million shares of the Company's Class A common

10   stock. The Registration Statement was declared effective by the SEC on or about March 28, 2012.

11   33.    The March 23, 2012 S-1/A Registration Statement noted the purported strength and

12   popularity of its recent acquisition of OMGPOP and *Draw Something* and again purported to warn of

13   its dependence on Facebook and that Facebook could change its gaming platform making it more

14   difficult for Zynga users to access and play its games. The Company failed to disclose the degree to

15   which such changes to the Facebook platform had already begun to occur, negatively impacting the

16   Company's current and future bookings, and thus its revenue, bookings and earnings prospects:

17         We are subject to Facebook's standard terms and conditions for application
           developers, which govern the promotion, distribution and operation of games and
18         other applications on the Facebook platform. We have entered into an addendum to
           these terms and conditions pursuant to which we have agreed to use Facebook
19         Credits, Facebook's proprietary payment method, as the primary means of payment
           within our games played through Facebook. This addendum expires in May 2015.
20
           Our business would be harmed *if*:
21
           •  facebook discontinues or limits access to its platform by us and other game
22            developers;

23                              *       *       *

24         •  facebook modifies its terms of service or other policies, including fees
              charged to, or other restrictions on, us or other application developers, or
25            Facebook changes how the personal information of its users is made
              available to application developers on the Facebook platform or shared by
26            users;

27                              *       *       *

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 8 -

1       *If Facebook loses its market position* or otherwise falls out of favor with Internet
        users, we would need to identify alternative channels for marketing, promoting and
2       distributing our games, which would consume substantial resources and may not be
        effective. In addition, Facebook has broad discretion to change its terms of service
3       and other policies with respect to us and other developers, and those changes may be
        unfavorable to us. For example, in 2010 Facebook adopted a policy requiring
4       applications on Facebook accept only its virtual currency, Facebook Credits, as
        payment from users. As a result of this change, which we completed in April 2011,
5       Facebook receives a greater share of payments made by our players than it did when
        other payment options were allowed. *Facebook may* also change its fee structure,
6       add fees associated with access to and use of the Facebook platform, change how the
        personal information of its users is made available to application developers on the
7       Facebook platform or restrict how Facebook users can share information with friends
        on their platform. Beginning in early 2010, Facebook changed its policies for
8       application developers regarding use of its communication channels. These changes
        limited the level of communication among users about applications on the Facebook
9       platform. As a result, the number of our players on Facebook declined.   Our
        agreement with Facebook allows our users to use Zynga-branded game cards for the
10      redemption of Facebook Credits.The agreement allows us to continue to distribute
        our game cards only until April 30, 2012. Our future bookings and revenue may be
11      negatively impacted upon the expiration of the game card program on April 30,
        2012. Any such changes in the future could significantly alter how players
12      experience our games or interact within our games, which may harm our business.

13          34.    On March 28, 2012, the Company issued a press release announcing the pricing of the

14   Secondary Offering at $12.00 per share and stating that the Registration Statement had been declared

15   effective:

16          **Zynga Announces Pricing of Secondary Offering**

17              . . . Zynga Inc. today announced the pricing of 42,969,153 shares of its Class
            A common stock at $12.00 per share in a secondary offering. All of the shares will be
18          sold by existing stockholders. In addition, the underwriters have a 30-day option to
            purchase up to an additional 6,445,373 shares of Class A common stock from certain
19          of the selling stockholders. As part of the offering, all selling stockholders, as well as
            all officers and directors, have agreed to lock-up agreements that extend the transfer
20          restrictions on their shares until at least 90 days following the offering.

21          35.    On March 29, 2012, Zynga filed a Prospectus pursuant to SEC Rule 424(b)(4) in

22   connection with the Secondary Offering.

23          36.    On April 3, 2012, in connection with the Secondary Offering, certain of the

24   Company's insiders, including defendants Pincus, Wehner and Schappert, sold more than 18.8

25   million shares of their Zynga stock at $12.00 per share for total proceeds of more than $219 million.

26          37.    On April 3, 2012, the Company announced that it had closed the Secondary Offering,

27   selling 49.4 million shares, including the exercise of 6.4 million shares in the over-allotment by the

28   underwriters:

**Zynga Announces Closing of Secondary Offering**

. . . Zynga Inc. today announced the completion of an underwritten public offering of an aggregate of 49,414,526 shares of its Class A common stock, including 6,445,373 shares of Class A common stock sold pursuant to the full exercise by the underwriters of their option to purchase additional shares. ***All of the shares were sold by selling stockholders at a price to the public of $12.00 per share.***

38.     On April 4, 2012, Zynga stock closed at $12.22 per share.

39.     On April 26, 2012, the Company issued a press release announcing its financial results for the first quarter of fiscal 2012 and ***raising*** the Company's bookings and EBITDA guidance for the remainder of the fiscal year to $1.425-$1.5 billion and $400-$450 million, respectively.  The press release stated as follows:

**Zynga Reports First Quarter 2012 Financial Results**

*- Highest Ever Bookings of $329 Million, Up 15% Year-Over-Year and Up 7% From Q4 2011*

*- Strong Growth in Player Network with 182 Million Monthly Unique Users, Up 25% Year-Over-Year*

*- **Zynga Raises Bookings and EBITDA Guidance for Fiscal Year 2012***

. . . Zynga Inc., the world's leading provider of social game services, today announced financial results for the quarter ending March 31, 2012.

- *Q1 record bookings of $329 million, up 15% year-over-year*

- *Q1 revenue of $321 million, up 32% year-over-year*

- *Q1 adjusted EBITDA of $87 million, down 23% year-over-year driven primarily by increased investment in new game development*

- *Q1 non-GAAP EPS of $0.06 and GAAP EPS of ($0.12)*

                    *       *       *

- **Secondary offering:** On April 3, 2012 Zynga completed an underwritten public offering of 49,414,526 shares of its Class A common stock. As part of the offering, all selling stockholders, as well as all officers and directors, agreed to lock-up agreements that extend the transfer restrictions on their shares until at least 90 days following the offering. The principal purposes of the offering were to facilitate an orderly distribution of shares and to increase the company's public float. Zynga did not receive any proceeds from the sale of shares in the offering.

**2012 Outlook**

As of today, we're updating our outlook for 2012 as follows:

- Bookings are projected to be in the range of $1.425 billion to $1.5 billion. We expect that growth will be weighted towards the second half of the year with slower sequential growth in the first half of the year.

- Adjusted EBITDA is projected to be in the range of $400 million to $450 million.

\* \* \*

- Our effective tax rate for non-GAAP net income is projected to be in the range of 25% to 30%.

\* \* \*

- Full year 2012 non-GAAP EPS is projected to be in the range of $0.23 to $0.29.

40. The Class Period representations by defendants were each materially false and misleading when made, as defendants failed to disclose the true facts which were known or recklessly disregarded by them, including the following:

(a) The December 15, 2011 Registration Statement failed to disclose that under Zynga's agreements with Facebook, Zynga game cards could only be distributed and redeemed on Facebook until April 30, 2012, or the true extent of the current risk of Facebook policy changes on Zynga's bookings prospects and overall financial condition;

(b) Facebook, upon which the Company was heavily reliant for users and bookings, had already begun to change its platform and user policies to a degree that would negatively impact Zynga's current and future bookings metrics and growth prospects;

(c) The March 2012 acquisition of OMGPOP and "Draw Something" could not support the increased bookings and financial forecasts issued on April 26, 2012; and

(d) In light of the facts set forth above, the Company did not have a reasonable basis for the bookings and EBITDA and financial projections issued during the Class Period.

## THE TRUTH BEGINS TO BE DISCLOSED

41. On July 25, 2012, the Company issued a press release announcing second quarter fiscal 2012 financial results below Wall Street estimates, stating that the Company had experienced a sequential decline in bookings. The Company also substantially reduced its 2012 bookings, EBITDA and EPS outlook to below even the February 14, 2012 bookings and earnings outlook,

1  which the Company had *increased* on April 26, 2012, claiming that expectations of its March 21,

2  2012 acquisition of *Draw Something* had dimmed, and that changes to Facebook's web platform had

3  hurt its results and outlook:

**Zynga Reports Second Quarter 2012 Financial Results**

- *Revenues of $332 Million, Up 19% Year-Over-Year*

- *Bookings of $302 Million, Up 10% Year-Over-Year*

      . . . Zynga Inc., the world's leading provider of social game services, today announced financial results for the second quarter ended June 30, 2012.

- *Q2 Revenue of $332 million, up 19% year-over-year, six months year-to-date revenue of $653 million, up 25% year-over-year*

- *Q2 Bookings of $302 million, up 10% year-over-year, six months year-to-date bookings of $631 million, up 12% year-over-year*

- *Q2 GAAP EPS of ($0.03), down from $0.00 in the second quarter of 2011, six months year-to-date GAAP EPS of ($0.15), down from $0.00 in the first half of 2011*

- *Non-GAAP EPS of $0.01, down from $0.05 in the second quarter of 2011, six months year-to-date non-GAAP EPS of $0.06, down from $0.16 in the first half of 2011*

                    *     *     *

**Business Highlights**

- Daily active users (DAUs) increased from 59 million in the second quarter of 2011 to 72 million in the second quarter of 2012, up 23% year-over-year.

- Monthly active users (MAUs) increased from 228 million in the second quarter of 2011 to 306 million in the second quarter of 2012, up 34% year-over-year.

- Monthly unique users (MUUs) increased from 151 million in the second quarter of 2011 to 192 million in the second quarter of 2012, up 27% year-over-year.

- Average daily bookings per average DAU (ABPU) decreased from $0.051 in the second quarter of 2011 to $0.046 in the second quarter of 2012, down 10% year-over-year.

- Monthly Unique Payers (MUPs) increased from 3.5 million in the first quarter of 2012 to 4.1 million in the second quarter of 2012, up 16% sequentially.

                    *     *     *

**Second Quarter 2012 Financial Summary**

- **Revenue:** Revenue was $332.5 million for the second quarter of 2012, an increase of 19% compared to the second quarter of 2011 and an increase of 4% compared to the first quarter of 2012. Online game revenue was $291.5 million, an increase of 10% compared to the second quarter of 2011 and a decrease of $1.2 million compared to the first quarter of 2012. Advertising revenue was $40.9 million, an increase of 170% compared to the second quarter of 2011 and an increase of 45% compared to the first quarter of 2012.

- **Bookings:** Bookings were $301.6 million for the second quarter of 2012, an increase of 10% compared to the second quarter of 2011 and a decrease of 8% compared to the first quarter of 2012.

- **Net income (loss):** Net loss was $22.8 million for the second quarter of 2012 compared to net income of $1.4 million for the second quarter of 2011. Net loss for the second quarter of 2012 included $95.5 million of stock-based expense compared to $33.1 million of stock-based expense included in the second quarter of 2011.

- **Non-GAAP net income:** Non-GAAP net income was $4.6 million for the second quarter of 2012, a decrease of 88% compared to the second quarter of 2011 and a decrease of 90% compared to the first quarter of 2012.

- **Adjusted EBITDA:** Adjusted EBITDA was $65.3 million for the second quarter of 2012 compared to $65.1 million for the second quarter of 2011 and $86.8 million in the first quarter of 2012.

- **EPS:** Diluted EPS was ($0.03) for the second quarter of 2012 compared to $0.00 for the second quarter of 2011 and ($0.12) for the first quarter of 2012.

- **Non-GAAP EPS:** Non-GAAP EPS was $0.01 for the second quarter of 2012 compared to $0.05 for the second quarter of 2011 and $0.06 for the first quarter of 2012.

- **Cash and cash flow:** As of June 30, 2012, cash, cash equivalents and marketable securities were $1.6 billion, compared to $964.5 million as of June 30, 2011 and $1.5 billion as of March 31, 2012. Cash flow from operations was $67.0 million for the second quarter of 2012, compared to $74.1 million for the second quarter of 2011. Free cash flow was ($204.4) million for the second quarter of 2012 as reported or $29.3 million excluding the purchase of the company's headquarters, compared to ($0.4) million for the second quarter of 2011.

**2012 Outlook**

*We are lowering our outlook to reflect delays in launching new games, a faster decline in existing web games due in part to a more challenging environment on the Facebook web platform, and reduced expectations for Draw Something. As a result, our updated outlook for 2012 is as follows*:

- Bookings are projected to be in the range of $1.15 billion to $1.225 billion.

- Adjusted EBITDA is projected to be in the range of $180 million to $250 million.

- Stock-based expense is projected to be in the range of $410 million to $430 million.

- Capital expenditures are projected to be in the range of $370 million to $380 million, which includes the purchase of our corporate headquarters building in April 2012.

- Our effective tax rate for non-GAAP net income is projected to be in the range of 50% to 60%.

- Non-GAAP weighted-average diluted shares outstanding are projected to be approximately 845 million shares in the fourth quarter of 2012.

- *Full year 2012 non-GAAP EPS is projected to be in the range of $0.04 to $0.09.*

42.     On July 26, 2012, the Company's stock price plummeted 37% in response to the July 25, 2012 announcement of its financial results, closing at $3.17 per share.

43.     On July 26, 2012, Yahoo published an article by Henry Blodget, entitled "Zynga Insiders Who Cashed Out Before the Stock Crashed":

In April, Zynga conducted a "secondary stock offering" in which insiders *dumped 43 million shares of stock at $12 a share, raking in about $516 million*.

Yesterday, four months later, Zynga reported a horrible quarter, and the stock plunged to $3.

*In other words, Zynga insiders cashed out at exactly the right time.*

In fact, they cashed out in the *same quarter in which Zynga imploded.*

*The quarter had already begun when Zynga insiders shoveled their stock out the door.*

By the time the quarter ended, Zynga's business (and stock price) was in the tank.

\*       \*       \*

*And, thanks to the offering, the Zynga insiders* took $516 million off the table just before the stock crashed.

Which Zynga insiders took advantage of this brilliantly timed sale?

How much did they make?

Here are some of the selling shareholders:

- Marc Pincus, Zynga's CEO, sold 16.5 million shares for $200 million

- Institutional Venture Partners, a Zynga investor, sold 5.8 million shares for $70 million

1    • Union Square Ventures, a Zynga investor, sold 5.2 million shares for $62
        million

2    • Google, a Zynga investor, sold 4 million shares for $48 million

3
     • SilverLake Partners, a Zynga investor, sold 4 million shares for $48 million
4
     • Reid Hoffman, a Zynga investor, sold 688,000 shares for $8.2 million
5
     • David Wehner, Zynga's CFO, sold 386,000 shares for $4.6 million
6
     • John Schappert, Zynga's COO, sold 322,000 shares for $3.9 million
7
     • Reginald Davis, Zynga's General Counsel, sold 315,000 shares for $3.8
8        million

9                                **LOSS CAUSATION**

10       44.    During the Class Period, as detailed herein, defendants made false and misleading

11   statements about Zynga's business and prospects and engaged in a scheme to deceive the market.

12   This artificially inflated Zynga's stock price and operated as a fraud or deceit on the Class. Later,

13   when defendants' prior misrepresentations and fraudulent conduct became apparent to the market,

14   Zynga's stock price fell precipitously, as the prior artificial inflation came out of the stock price over

15   time. As a result of their purchases of Zynga common stock during the Class period, plaintiff and

16   other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

17                                **NO SAFE HARBOR**

18       45.    Zynga's "Safe Harbor" warnings accompanying its reportedly forward-looking

19   statements ("FLS") issued during the Class Period were ineffective to shield those statements from

20   liability. To the extent that projected revenues and earnings were included in the Company's

21   financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"),

22   including those filed with the SEC on Form 8-K, they are excluded from the protection of the

23   statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

24       46.    The defendants are also liable for any false or misleading FLS pleaded because, at

25   the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

26   authorized and/or approved by an executive officer of Zynga who knew that the FLS was false.

27   None of the historic or present tense statements made by defendants were assumptions underlying or

28   relating to any plan, projection or statement of future economic performance, as they were not stated

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                        - 15 -

1  to be such assumptions underlying or relating to any projection or statement of future economic

2  performance when made, nor were any of the projections or forecasts made by defendants expressly

3  related to or stated to be dependent on those historic or present tense statements when made.

4                                **CLASS ACTION ALLEGATIONS**

5       47.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

6  of Civil Procedure on behalf of all persons who purchased or otherwise acquired Zynga common

7  stock during the Class Period.

8       48.    Excluded from the Class are defendants and their families, the officers and directors

9  of the Company, at all relevant times, members of their immediate families and their legal

10  representatives, heirs, successors or assigns and any entity in which defendants have or had a

11  controlling interest.

12      49.    The members of the Class are so numerous that joinder of all members is

13  impracticable. The disposition of their claims in a class action will provide substantial benefits to

14  the parties and the Court. Zynga has over 218 million shares of stock outstanding, owned by

15  hundreds or thousands of persons.

16      50.    There is a well-defined community of interest in the questions of law and fact

17  involved in this case. Questions of law and fact common to the members of the Class that

18  predominate over questions which may affect individual Class members include:

19             (a)    Whether the 1934 Act was violated by defendants;

20             (b)    Whether defendants omitted and/or misrepresented material facts;

21             (c)    Whether defendants' statements omitted material facts necessary to make the

22  statements made, in light of the circumstances under which they were made, not misleading;

23             (d)    Whether defendants knew or deliberately disregarded that their statements

24  were false and misleading;

25             (e)    Whether the price of Zynga common stock was artificially inflated; and

26             (f)    The extent of damage sustained by Class members and the appropriate

27  measure of damages.

28

1      51.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

2 sustained damages from defendants' wrongful conduct.

3      52.     Plaintiff will adequately protect the interests of the Class and has retained counsel

4 who are experienced in class action securities litigation. Plaintiff has no interests which conflict

5 with those of the Class.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

53.     Plaintiff incorporates ¶¶1-52 by reference.

54.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Zynga common stock during the Class Period.

56.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Zynga common stock and suffered damages when that inflation was eliminated by disclosure of information that revealed the facts and conditions hidden by defendants' fraudulent statements and omissions, or the economic impact of those facts and conditions. Plaintiff and the Class would not have purchased Zynga common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

1    57.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

2  the other members of the Class suffered damages in connection with their purchases of Zynga

3  common stock during the Class Period.

4                                    **COUNT II**

5                      **For Violation of §20(a) of the 1934 Act**
                              **Against All Defendants**

6    58.    Plaintiff incorporates ¶¶1-57 by reference.

7    59.    The Individual Defendants acted as controlling persons of Zynga within the meaning

8  of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Zynga and

9  their ownership of Zynga stock, the Individual Defendants had the power and authority to cause

10 Zynga to engage in the wrongful conduct complained of herein. Zynga controlled each of the

11 Individual Defendants and all of its employees. By reason of such conduct, defendants are liable

12 pursuant to §20(a) of the 1934 Act.

13                                **PRAYER FOR RELIEF**

14    WHEREFORE, plaintiff prays for relief and judgment, as follows:

15    A.    Determining that this action is a proper class action and certifying plaintiff as a Class

16 representative under Rule 23 of the Federal Rules of Civil Procedure;

17    B.    Awarding compensatory damages in favor of plaintiff and the other Class members

18 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

19 wrongdoing, in an amount to be proven at trial, including interest thereon;

20    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

21 action, including counsel fees and expert fees; and

22    D.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 18 -

1     **JURY DEMAND**

2     Plaintiff hereby demands a trial by jury.

3     DATED: July 31, 2012                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
4                                            SHAWN A. WILLIAMS

5

6                                            _____
                                                      SHAWN A. WILLIAMS
7
                                             Post Montgomery Center
8                                            One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
9                                            Telephone: 415/288-4545
                                             415/288-4534 (fax)
10
                                             ROBBINS GELLER RUDMAN
11                                             & DOWD LLP
                                             DARREN J. ROBBINS
12                                           DAVID C. WALTON
                                             655 West Broadway, Suite 1900
13                                           San Diego, CA  92101
                                             Telephone: 619/231-1058
14                                           619/231-7423 (fax)

15                                           JOHNSON & WEAVER, LLP
                                             FRANK J. JOHNSON
16                                           BRETT M. WEAVER
                                             110 West A Street, Suite 750
17                                           San Diego, CA  92101
                                             Telephone: 619/230-0063
18                                           619/255-1856 (fax)

19                                           Attorneys for Plaintiff

20    S:\CptDraft\Securities\Cpt Zynga.doc

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 19 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Cory Draper, ("Plaintiff") declare:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 3/23/2012 | 200 | 13.45 |
| 3/26/2012 | 250 | 13.434 |
| 03/27/2012 | 50 | $12.92 |
| 04/20/2012 | 200 | $9.439 |
| 04/26/2012 | 100 | $9.2 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 3/23/2012 | 200 | 13.37 |

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3 0ᵗʰ day of July , 2012.

Cory Draper
Plaintiff